Good morning, Your Honors. Jeanette McPherson, on behalf of the appellant. Speak and bring the mic up just a bit. Thank you. Good morning. May it please the Court, Jeanette McPherson of Schwartzman McPherson Law Firm, on behalf of the appellant CT Cimarron. This is our appeal from the U.S. District Court's decision in which it reversed the bankruptcy court's decision. You know, this is probably the worst courtroom in the world to hear. I'm sorry. So even if you speak normally, pretend the mic's not there and you have to project all the way up here so we can get your words. I will do that. Thank you. It's not your fault. It's ours. We've got to fix this. The bankruptcy court had entered judgment in favor of CT Cimarron. This appeal revolves around a ground lease in which Northern Wolverine is a lessor and CT Cimarron is a lessee. CT has spent in excess of $5 million acquiring various assets, which include this ground lease, which is a central portion of its golf course. CT acquired this ground lease in connection with the bankruptcy case of CGC, which is an unaffiliated entity. CGC filed bankruptcy in Nevada and, in connection with that bankruptcy case, sold its rights to this ground lease free and clear of any defaults, and CT was a successful purchaser. And, by the way, Northern Wolverine was part of those pleadings, had notice, and participated in that process. Despite being involved in that process, Northern Wolverine declared a sham default under that lease based upon these preexisting defaults that were taken care of in connection with the bankruptcy court order and transfer the property to a trustee, Trustee Batley, in an unrelated bankruptcy proceeding. And Trustee Batley declared a sham default and refused the rent from CT. As a result, CT had to defend the rights that it had spent tremendous time on. I guess I gather that CT, if it's granted the right of first refusal, would like to exercise that right, correct? That's correct, Your Honor. It would have liked to have exercised that right, but it was never given that opportunity. It wasn't given notice of everything. It didn't have the opportunity to enforce its rights under that right of first refusal that it had bargained for. And, as a result, we believe that the adequate remedy is to grant it a 100 percent non-merging fee interest in the property. We believe that is the adequate remedy in this case. So how do you respond to the district court's analysis about what occurred in Alaska in terms of that bankruptcy? That seems to be the core issue here. Right, Your Honor. The district court relied on a case by the name of Hartsine, and Hartsine, the transfer was between grandparents and grandchildren. And in this case, they used Hartsine to find that there were no true negotiations, but the evidence indicates otherwise. There were true negotiations. They also found that the bankruptcy trustee, Trustee Batley, in Alaska was not truly an unaffiliated party, citing to the fact that the trustee does receive a commission. Why did Batley take this case back? I mean, why would he take this property back? The case, as I understand it, the bankruptcy matter was resolved in Alaska. Her estate no longer had any interest in the property. So why did Batley take this thing back? Well, Your Honor, from what we can tell from the correspondence, the deal was made that he would take the property back to pursue these claims for Northern Wolverine. And the deal was he would take it back, he'd pursue the claims against Riverside County and Cathedral City and renegotiate this lease with CT. And what did the estate get in exchange for that? A one-half interest? Actually, the whole property was conveyed to Trustee Batley, 100% interest. How did that happen, the whole property was conveyed? He owned half, his ex-wife owned half, right? Well, ultimately, Northern Wolverine owned 100% of the property. It owned 100%, and initially it conveyed half interest by quick claim to Trustee Batley. And then after speaking with the trustee, we believe he conveyed 100% fee interest. But if Northern Wolverine, Northern Wolverine was sort of an alter ego for Richard Wagner, right? Well, Richard Wagner was the sole owner. He had principal interest in this thing. So if Northern Wolverine had it at that point, her estate doesn't have an interest in this land. She's given up her interest in the land at some point. Her estate has given up the interest in the land at some earlier point in the proceedings. Correct, Your Honor. It was sold. So when Northern Wolverine conveys this back to the bankruptcy trustee in Alaska, they have to convey 100% of it back. That's correct, Your Honor. They're not giving up Wagner's one-half interest. That's all been resolved at an earlier point. That's correct, Your Honor. The property was sold from the Wagner estate to OB Sports, which was the nominee. And CGC was a nominee for OB Sports, which Northern Wolverine then purchased it. Okay, so what interest does the bankruptcy estate have in property it doesn't own? How can the trustee even take the property? Its interest is there because it was conveyed. It was conveyed pursuant to this quick claim, the two quick claims. It's the two quick claim deal. Now, it doesn't identify what are the two quick claims. Why two rather than one? Well, two quick claims because the half interest was conveyed, and then the parties realized Northern Wolverine had 100%. That's the problem I have. I assumed it was for each half of the property. But Richard only owns one half. Why does he have power to give a quick claim deed on the half that went to the bankruptcy estate, assuming it's even there, even after the bankruptcy trustee decided he had no more interest? Well, Your Honor, Northern Wolverine actually owned 100%. Richard Wagner was the sole owner of Northern Wolverine. Wait a minute. There was a division under the divorce. She got half the property. He got half the property. How does he get 100%? But Trustee Batley, when the bankruptcy case was first opened, sold both portions, Richard Wagner's half and Jane Wagner's half. So the trustee has authority to sell the whole. He gave the proceeds back to Richard Wagner. But then Richard Wagner, through his entity, Northern Wolverine, then repurchases from the new buyer. 100%? 100%, which was CGC. On credit? Correct. On credit. He gives back a promissory note. Is this all in the records someplace? Yes, it is, Your Honor. Is it really? Okay. The facts are a little convoluted, but the fact is that Northern Wolverine obtains 100%. I made my little schematic here going from point A to point B to point C to point D. And I had some trouble with it, but I couldn't find in the record verification. But you say it is there. Yes, it is, Your Honor. Just very briefly. So then do these – is it – these two quit claims disposed of the property? Yes, Your Honor. It was disposed of in accordance with the language of the right of first refusal. And that finding was made by the bankruptcy court and the district court. And that's where the first refusal comes in because the property is disposed of by these two quit claim deeds, at which time Richard had power to give those two quit claim deeds for 100% of the property. Correct, except that it was Northern Wolverine that gave – that quit claimed the property. Do you want to save some time for a bottle? Yes, Your Honor. Thank you. Very good. Thanks. Mr. Bartley, you've heard our questions, so you kind of know where we're headed. You should identify yourself. I'm kind of chuckling to myself because it is a very involved and complex factual history in this case that led to this point. I believe suffice it to say – and, yes, I could answer all these questions that you posed as to how we got from point A to, you know, 1989 to where we are now. Well, let me see if I can shortcut it, see if I understand it. My deduction from looking at these transactions is that your client, Mr. Wagner, transferred initially his half interest to the bankruptcy estate in Alaska so that the property could be sold because the trustee had no market for half an interest in property. Is that so? That's basically correct, Your Honor. Your Honor, before their divorce, Patricia Wagner transferred her half interest in this property to Mr. Wagner, and then they got divorced and she filed for bankruptcy. Her half then came back into the bankruptcy estate. At that point in time, some time passed, and in that time, the county of Riverside and Cathedral City did some things on the property taxes, such as had a property tax sale of the property that Mr. Wagner disagreed with. So an agreement was reached with the bankruptcy trustee in Alaska for Mr. Wagner to transfer his half to the bankruptcy trustee and then sell the entire fee interest to a third party. May I ask you, there was the Cathedral property tax sale. Did that occur before the bankruptcy was initially closed or converted to a Chapter 7? It occurred during the bankruptcy case. I believe it was after the conversion to the 7. All right. So he transfers the interest so they can be sold and you can try to do something with the taxes, right? Yes. He wanted somebody to do something about the tax issue. So then the bankruptcy case is concluded in Alaska. What motivated you? I gather that the tax issue wasn't settled then. Is that right? Your Honor, ultimately nobody took any formal action to pursue any damages against Riverside County or to overturn the tax sale. The agreement with the bankruptcy trustee was to actually sell the property, and O.B. Sports was the entity that purchased the property in the tax sale. So an agreement was made with whoever controlled O.B. Sports to sell the property. They formed a new entity at that point in time to take title. It wasn't O.B. Sports that took title. It was Cimarron Golf Club. Right, okay. And that's how that all happened. So they have the tax, at least whatever title is distributed by the tax sale. Right. And your client then formed Wolverine and purchased that out of the bankruptcy state. Correct. Okay. Well, actually they purchased it after the sale out of bankruptcy to Cimarron Golf Course because there was also an agreement to simultaneously sell the property to an entity formed by Mr. Wagner, which is Northern Wolverine. At the same time, title was transferred to Cimarron Golf Club. So it was a connected series of transactions that took place all at the same time. Okay, now we get to the transfer back. I mean, it's really odd to open up a closed Chapter 7 bankruptcy in which the debtor is deceased, I must say. It is odd. So what happened? The motivation behind that, Your Honor, was, again, Mr. Wagner believed that Trustee Batley, during the initial Chapter 7 proceedings, should have done more to vindicate the estate and his interest in pursuing damages against Riverside County and Cathedral City. That's really where his tunnel vision is leading him. So he comes up with an agreement with the trustee that he tries to convince the trustee to take action, to reopen the bankruptcy case to take action to vindicate this claim. And if the claim had been vindicated, money would have come into the now-reopened bankruptcy estate? Well, there was some discussion that if damages were recovered, they would be split between Mr. Wagner and the bankruptcy estate, which in effect would go to Mr. Wagner's heirs because at that point in time, there really wasn't anything left to administer. How much are we talking about here? Money? Yes. As far as damages? Yeah. What was Wagner hoping to get from Riverside County? I have no idea, Your Honor. We don't know. But there was some agreement that maybe these damages would sort of relate back? Well, among these things, he believed that there was an easement. This is the Cathedral City part of it. There was an easement granted by the city across this property for flood control or something that he thought was done improperly, and so he felt that that damaged the value of the property. And then he was also hoping that Batley would renegotiate the leases with C.T. Simmer on it, right? That's correct. So why isn't there consideration for that deal? Well, Your Honor, the reason that we believe the district court was correct is that, granted there was a transfer, but we don't believe that there was really any valid consideration or legal consideration given for this transfer for a number of reasons. Number one, obviously no money change hands, which isn't conclusive, obviously. Number two, what Mr. Wagner wanted the trustee to do, he had no power to enforce. He couldn't make the trustee reopen the case. How about the bankruptcy court? But the trustee agrees to reopen the case to pursue a claim on behalf of the bankruptcy estate and Wagner and to renegotiate. Why isn't that sufficient consideration to support the transfer? Well, the claims actually had been sold to Mr. Wagner, and he never transferred them back to the trustee. So the trustee, I mean, the whole thing was to give the trustee standing to pursue these claims. That was the purpose of conveying the property, is to give the trustee standing, because otherwise there was nothing for him to do. Basically, it was this whole mess came out of a plan that really wasn't thought through well as to how this was actually going to work and whether the trustee even had the power to do what Mr. Wagner wanted him to do. And I think it's questionable that he did have the power to do what Mr. Wagner wanted him to do. The other point to consider under the hard-signed factors, of course, is obviously the intent of the parties that were doing this conveyance, and it was not intended, as the district court found, to be a permanent disposition of the property.  He was temporarily, in his mind, transferring it to the trustee who was going to do stuff that was going to benefit Mr. Wagner and his heirs. And then when that was done, the property would end up either back with Mr. Wagner or his corporation or with his heirs, which that was his whole thinking on it. That's a lot of moving pieces. Granted. It's not something I would have advised him to do, but it happened. So the fact remains, and the really simple issue that we're dealing with in this appeal is, did these – did this conveyance through the quick claim deed trigger the right of first refusal in the ground lease? When you say this conveyance, you mean the two quick claim deeds? Correct. Do you – is there any doubt that those two quick claim deeds were valid? No doubt. I mean, they're certainly effective to, of record, transfer the title. So there's been a disposition of title. There was a disposition, as the district court found. Yes, that's a disposition that couldn't bring it in. The 9.04 says the lessor shall not sell or grant options with respect or otherwise dispose. He has disposed. That is correct. But there's more to triggering the right of first refusal than simply the disposition under the hard time factors. Right, but this is a lot different from somebody transferring for estate planning purposes or otherwise from a grandparent to a grandchild. I mean, this is to a third party to pursue claims and negotiate. On behalf of the family of Mr. Wagner. Well, except that the trustee does not answer to Mr. Wagner. He doesn't. He answers to the creditors and the bankruptcy estate in Alaska. That's correct, but at the time there were no creditors. Well, it doesn't make any difference, does it, if it's a bankruptcy estate? Well, it makes a difference when you look at the motivation, which is an important part of the hard time factor as to why this conveyance is taking place. It's not a permanent disposition of the property. It's to do something entirely different that doesn't represent a conveyance of the property away. Mr. Wagner is not getting rid of the property by doing this. You know, I tend to think that if the bankruptcy court in Alaska had been fully apprised of that, they might well think that he was transferring it back because the bankruptcy estate. The bankruptcy court was aware of it, Your Honor. Well, it reopened the estate, but on the basis that it was going to pursue a claim that would bring back money into the estate, not to get it back to Mr. Wagner.  But the estate is a separate entity. Right, but once the bankruptcy judge in Alaska learned what was going on, he cast very great doubt on the efficacy of what, you know, they were trying to do. And, in fact, the trustee just abandoned the property. Right, the trustee got a little nervous about it and then abandoned the property. Well, it shouldn't have happened. Counselor, there are certain risks here that Mr. Wagner assumed. For example, once he transferred the property out of Northern Wolverine, if Mr. Wagner had died, I don't think his estate would have had any claim against the bankruptcy trustee, in which case the property is gone. Well, they would have because it's Patricia Wagner's bankruptcy, and so any surplus property that's not needed to pay creditors goes to her estate. Yeah, but we don't know that. You're telling us that Mr. Wagner. Yeah, but you're telling us that. No, but he was fine with that. You know, it's his kids. Right, but the point is this was a full-blown disposition, and Mr. Wagner had no guarantee that this property was coming back to him. From C.T. Cimarron's position, he's given the property away. Mr. Wagner didn't look at it that way. He figured it was either coming back to him, his corporation, or his kids. Well, I understand he didn't look at it that way. And there's an exception in the right of first refusal if it goes to, for estate planning purposes, if you make a transfer to your family. But the bankruptcy trustee usually isn't a vehicle for estate planning. Well, I agree. It's unusual, but, you know, it would have worked in this instance. I don't think so. I don't see how it effectively works if it's not a sham transaction. If it's a legitimate transaction supported by consideration, then they have a right of first refusal. If it's simply sort of a sham transaction. Well, what I meant, what worked is that Mr. Wagner is correct that he or his family would not have lost control of this property. Okay. Let me ask you a practical question. Is there much? I mean, if you win this appeal, you still have to deal with C.T. Cimarron. They're your last hope. Correct. They still have a lease. And they still have a lease. They've got a right of first refusal. They want to buy the property. If you lose the appeal. And they can. If Mr. Wagner wants to sell it, they have the right of first refusal. Yeah. Okay. So their rights are still preserved. They're not affected by any of this. Excellent. Any further questions? All right. Thank you, counsel. Thank you. Mr. Bartlett just stated that C.T.'s rights haven't been affected by any of this. As we stand here today, we don't know who owns this property. Northern Wolverine objected to the Trustee Batley's abandonment motion, saying the property should not be abandoned. And in theory, when property is abandoned by a bankruptcy estate, it goes back to the debtor. And so, therefore, Northern Wolverine does not have ownership of this property. Was there a danger that C.T. Cimarron was going to lose its rights under the lease? Well, Your Honor, this started out with allegations that there was a default under the lease, based upon these preexisting defaults that were taken care of when it purchased the lease. So there was danger initially because the trustee was declaring the sham default and using his status as a trustee. Does the property have any, in a practical sense, does the property have any alternative use other than a golf course? I mean, is this right in the middle of the golf course so nobody could develop it for anything else? I mean, are they just sort of holding C.T. Cimarron ransom for better lease terms? Is that what this was about? Or could it have been developed for something else? Your Honor, I don't have a lot of knowledge about what it could be developed for. It's my understanding that this ground lease is a central portion of this golf course, which is part of a development. And so it is critical. And C.T. did pay to obtain this lease. It's not like we can just put a Wal-Mart there if the golf course loses control of the property. That's my understanding, Your Honor. You can put a Wal-Mart anywhere, can't you? You can put it on 13th Hole and I may play a little more tough. Let me ask you this. In a practical, from your client's perspective, what is the status in terms of the county's claims against the county or the county's claim? Well, our position is if it had been given this offer, it could have negotiated with the county if those claims were legitimate. What are the claims from your point of view with the county? I mean, I heard tax, I heard easement. Your client or successor acquired the tax deed, right? Well, my client acquired the promissory note that underlies this transaction and the ground lease. These claims about problems with the county and the city are Mr. Wagner's claims that he always believed existed and that he's been fighting for, and he thinks the county violated the automatic stay. So these are his claims that he believes, whether they're legitimate or not, I think is very questionable. Well, are they monetary claims or are they claims about failure of takings claims? I know we should have asked. I think he believes that they're monetary claims. I see. I mean, just tax claims for violating the stay and taxes that aren't owed, or are they, I guess everything's a monetary claim in this sense, or is there an easement that's encumbering the property? I believe that he thinks there were improper tax assessments because in his pleadings he talks about he pleads that the trustee not abandon this property and put his, as he says, tax baby to rest. Okay. Those are his claims. Your client doesn't have a position on those claims one way or another, I gather? No, Your Honor. Okay. Any further questions? Yes. I want you to assume there was a disposition of the property by the two court-claimed deeds and therefore the lessee has a right of first refusal. Now, the bankruptcy judge at that position, if I understand correctly, and please correct me if I'm wrong, but as I understand it, at that time the bankruptcy court awarded the property to the lessee. Is that right? That's correct, Your Honor. At what point did the lessee exercise the right of first refusal? Well, Your Honor, what happened was CT learned of all of these activities of Northern Wolverine after the fact. It learned of this transfer in connection with getting letters that its rent was being refused. And at that point it said, you know, we weren't given the option that we are entitled to under that lease. Well, how does the bankruptcy court under that situation have power to grant the lessee the property if the lessee has never exercised the right of first refusal? Well, the lessee did exercise its right when it discovered all these things. And, in fact, it had to bring an action before the bankruptcy court on this issue that there was a violation of the right of first refusal. Well, there's one thing of suing for a violation of first refusal. There's another thing of making the first refusal, that is. At some point the bankruptcy judge must have felt that the lessee had exercised the power of first refusal because he granted the property. Yes, Your Honor. And the property, what had happened was the property was already disposed of. And so the formality wouldn't get CT anywhere essentially because it would have exercised that option, had that right to purchase, but it was never given that opportunity. It was never given the opportunity granted under the lease to match the offer, which is part of that right of first refusal. That's the problem I see with it. I mean, there are a lot of contracts that sort of become worthless because of the way they play out. But it seems to me at some point the bankruptcy judge has to have the power to say, you exercise your first refusal and we are going to enforce it. But if the lessee never exercised the right of first refusal, in some fashion, how does the bankruptcy judge conclude that it has been exercised? Does he just assume the lessee would have if the lessee had a chance and, therefore, that's enough? Yes, Your Honor. Judge Zive found that CT was really never, it was not given the opportunity to match that offer. And so Judge Zive said, you know, we don't know what would have happened, whether it could have met that consideration that was given. And because it wasn't given the opportunity to enforce the rights that it bargained for under that right of first refusal, that the adequate remedy is one of specific performance. And that's why he granted it. Well, I understand the bankruptcy judge has a lot of equity power that I don't fully understand. But I see your point. I think we should thank you for starting our week with this very clear case. Well, the other part of it, I think, and Judge Wallace has an excellent line of questioning, because the bankruptcy judge actually didn't grant specific performance. Well, effectively, that's, he references. I know you drafted the findings, so you could have. He references in. As far as I can tell, he has signatures on it, and he's in the judge's signing. That's correct, Your Honor. In the transcript, he talks about, essentially, specific performance. Right. But here's what he says. As a result of the facts and circumstances of this case, Wolverine breached Section 9.04 of the ground lease, and accordingly, CT is vested with a non-merging fee interest. I mean, that's a pretty big leap for saying there's a breach and, therefore, you get an interest, because specific performance would generally say, if you granted it, that you would be given X number of days to exercise the right of first refusal. Well, Your Honor, he effectively did the same thing by saying, I'm granting you today a 100% non-merging fee interest in the property. He even discussed how the property should not be, the ownership should not be tampered with at the time of that hearing. So, effectively, he was doing the same things. We may not be using the same words in the transcript. I do believe he mentioned the word specific performance. But, effectively, we get to the same place, because we're talking about land. No, I think the question is, does he have the right to do that? I mean, is that remedy? Assuming that he did that, how do you get from a breach to ownership of the property without you exercising the right of first refusal? Well, I think you get there because the right of first refusal was violated. And in the complaint that initiated this whole process, we asked for the remedy. And the remedy can only be the grant of the property, because there is no other way to compensate CT. Sure there is. There are two ways. One, damages. Two, by saying, all right, now you have X number of days to exercise your right of first refusal or not exercise it. I think that process was implicit in what was done, because the problem is that the property was already disposed of, and there was no way that CT at this point could attempt to even match that offer. And so the rights that it bargained for under that right of first refusal were gone. I understand that. But the right wasn't necessarily to have the property. The right was to have the right of first refusal. Right, and match the offer that was made. And that right, it wasn't given that opportunity. I understand that. I think the question is just whether or not the bankruptcy court dotted the I's and crossed the T's on the remedy. But I think we understand your position and our questions of taking the overtime. So unless there are further questions, we'll consider the case submitted. Thank you both for your arguments. Help us to eliminate a complicated case.
judges: Wallace, Thomas, Bybee